UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------X
FEDERAL INSURANCE COMPANY,

                  Plaintiff,

      - against -

SAFENET, INC., CAROLE ARGO,
and ANTHONY CAPUTO,

                  Defendants.
---------------------------------------X

**MEMORANDUM AND ORDER**

09 CV 7863 (NRB)

**NAOMI REICE BUCHWALD**
**UNITED STATES DISTRICT JUDGE**

Plaintiff Federal Insurance Company ("Federal" or "plaintiff") brings this action against defendants SafeNet, Inc. ("SafeNet"), Carole Argo ("Argo"), and Anthony Caputo ("Caputo," and together with SafeNet and Argo, "defendants"), seeking a declaratory judgment and the rescission of certain insurance contracts. Presently before us are the parties' cross motions for summary judgment. In the motions, the parties request various declarations concerning their respective rights and obligations under the insurance contracts.

For the reasons stated herein, plaintiff's motion for summary judgment is granted in part and denied in part and defendants' cross motion for summary judgment is denied.

## BACKGROUND

**I.    Factual Background**

     **A.    Parties**

During the time periods relevant to this action, SafeNet was a public company that provided information security technology to public and private customers.[1]  (PX-E (Form 8-K at 8).)  SafeNet is incorporated in Delaware and its principal place of business is in Maryland.  (Def. R. 56.1 ¶ 1.)  Argo was the Vice President and Chief Financial Officer of SafeNet and Caputo was SafeNet's Chairman and Chief Executive Officer.  (Pl. R. 56.1 ¶ 34; PX-R ¶ I.)

---

[1] Unless otherwise noted, the facts recited herein are drawn from Plaintiff Federal Insurance Company's Statement of Material Facts in Support of its Motion for Summary Judgment ("Pl. R. 56.1"), dated February 4, 2011, the Affirmation of Richard R. Johnson in Support Plaintiff Federal Insurance Company's Motion for Summary Judgment, dated February 4, 2011, and the exhibits annexed thereto ("PX-xx"), Defendant SafeNet's Rule 56.1 Statement of Material Facts in support of its cross motion for summary judgment ("Def. R. 56.1"), dated February 25, 2011, the Declaration of Ann V. Kramer in Support of Defendant SafeNet's Cross Motion for Summary Judgment and in Opposition to Plaintiff Federal's Motion for Summary Judgment, dated February 25, 2011, and the exhibits thereto ("DX-xx"), the Affirmation of Richard R. Johnson in Support Plaintiff Federal Insurance Company's Opposition to Defendants' Cross Motion for Summary Judgment, dated March 21, 2011, and the exhibits annexed thereto ("PX-Rxx").

Pursuant to Rule 56.1 of the Local Rules of the United States District Courts for the Southern and Eastern Districts of New York ("Local Rules"), "each statement controverting any statement of material fact[] must be followed by citation to evidence which would be admissible[] as required by Fed. R. Civ. P. 56(c)."  Local Rule 56.1(d).  Where a party opposing a motion for summary judgment fails to specifically controvert a statement of material fact, the statement is "deemed to be admitted for the purposes of the motion."  Local Rule 56.1(c); see also Major League Baseball Props., Inc. v. Salvino, Inc., 542 F.3d 290, 312 (2d Cir. 2008).  In arriving at these undisputed facts, we reject as insufficient conclusory or non-responsive objections.

### B.    2005/2006 Policies

From March 12, 2005 through March 12, 2006, SafeNet had two layers of directors and officers liability insurance.  (Pl. R. 56.1 ¶¶ 1, 2, 29; Def. R. 56.1 ¶ 2.)    National Union Fire Insurance Company of Pittsburgh, PA ("National Union") provided the first layer of insurance, which had a limit of liability of $10,000,000 ("First Primary Policy").  (Pl. R. 56.1 ¶ 2; Def. R. 56.1 ¶ 4.)   Plaintiff provided the second layer of insurance, which provided $5,000,000 in excess coverage ("First Excess Policy").  (Pl. R. 56.1 ¶ 1; Def. R. 56.1 ¶ 4.)  Subject to its terms and conditions, the First Excess Policy follows form to the First Primary Policy.  (Pl. R. 56.1 ¶ 2; Def. R. 56.1 ¶ 3.)

The First Excess Policy covers three types of claims: (1) losses incurred by a SafeNet director or officer, arising from Wrongful Acts of the director or officer, where the losses were not indemnified by SafeNet; (2) SafeNet's losses arising from a securities claim made against it; and (3) SafeNet's losses arising from Wrongful Acts of a SafeNet officer or director, where SafeNet indemnified the officer or director.[2]  (PX-B § 1.)

The First Excess Policy is a "claims made" policy. Pursuant to section 7 of the First Excess Policy:

> [a]n Organization or an Insured shall, as a
> condition precedent to the obligations of

---

[2]  Capitalized terms not defined herein are defined in the underlying contracts.

> the Insurer under this policy, give written
> notice to the Insurer of a Claim made
> against an Insured or a Crisis as soon as
> practicable: (i) after the Named Entity's
> Risk Manager or General Counsel (or
> equivalent position) first becomes aware of
> the Claim; or (ii) the Crisis commences.

(PX-B § 7(a).)   Section 7 further provides that certain claims

will relate back to the original notice of a claim.

Specifically, section 7(c) provides that:

> [i]f during the Policy period . . . an
> Organization or an Insured shall become
> aware of any circumstances which may
> reasonably be expected to give rise to a
> Claim being made against an Insured and
> shall give written notice to the Insurer of
> the circumstances . . . then a Claim which
> is subsequently made against such Insured
> . . . alleging, arising out of, based upon
> or attributable to such circumstances or
> alleging any Wrongful Act which is the same
> as or related to any Wrongful Act alleged or
> contained in such circumstances, shall be
> considered made at the time such notice of
> circumstances was given.

(Pl. R. 56.1 ¶ 20; PX-B § 7(c); Def. R. 56.1 ¶ 39.)   In the

policy, a 'Claim' is defined as "(1) a written demand for

monetary, non-monetary, or injunctive relief; (2) a civil,

criminal, administrative, regulatory or arbitration proceeding

for monetary, non-monetary or injunctive relief . . . ; or (3) a

civil, criminal, administrative or regulatory investigation of

an Insured Person . . ."  (PX-B § 2(b).)

4

The First Excess Policy contains provisions concerning the accuracy of the information in the insurance application.   In particular, Endorsement Number 4 provides that:

> [i]n granting coverage under this policy, it is agreed that the Insurer has relied upon the statements, warranties and representations contained in the Application as being accurate and complete.   All such statements, warranties and representations are the basis for the policy and are material to the risks assumed by the Insurer. . .

(Pl. R. 56.1 ¶ 25.)   The term 'Application' is, in turn, defined as "each and every signed application, any attachments to such applications, other materials submitted therewith or incorporated therein . . . and any public documents filed by an Organization with the Securities and Exchange Commission . . . prior to the inception date of this policy . . ." (Pl. R. 56.1 ¶ 24; PX-B at Endorsement No. 16.)

In addition, the First Excess Policy specifies circumstances that will void the policy.   Specifically, Endorsement Number 4 states:

> [t]he Insureds agree that in the event the particulars and statements contained in the Application are not accurate and complete, then this Policy shall be void as to any Insured who knew as of the inception date of the Policy Period of the facts that were not accurately and completely disclosed in the Application (whether or not the Insured actually knew the facts were not accurately disclosed in the Application) and as to any Insured to whom such knowledge is imputed.

5

(Pl. R. 56.1 ¶ 26.)   Endorsement Number 4 further provides for imputation of knowledge to other Insureds.   Notably, the endorsement states: "[f]or purposes of determining whether knowledge shall be imputed to an Insured: (1) knowledge possessed by a past or present, {i} chief executive officer or {ii} chief financial officer of the Named Entity shall be imputed to all Insureds . . ."  (Pl. R. 56.1 ¶ 28.)

Notwithstanding the imputation provisions, the First Excess Policy provides coverage "for any Non-Indemnifiable Loss of any Insured Person to whom knowledge is imputed . . . provided that such Insured Person did not have knowledge of the facts that were not accurately and completely disclosed."  (Pl. R. 56.1 ¶ 30.)   A 'Non-Indemnifiable Loss' is defined in the First Excess Policy as "Loss for which an Organization has neither indemnified nor is permitted or required to indemnify an Insured Person pursuant to law or contract or the charter, bylaws, operating agreement or similar documents of an Organization." (Pl. R. 56.1 ¶ 31.)

In addition to outlining the circumstances that will void the policy, the First Excess Policy also details grounds for excluding coverage under the policy.   For example, exclusion 4(a) states that:

> [t]he Insurer shall not be liable to make
> any payment for Loss in connection with any
> Claim made against an Insured: . . . (a)

> arising out of, based upon or attributable
> to the gaining of any profit or advantage to
> which a judgment or final adjudication . . .
> adverse to the Insured establishes that the
> Insured was not legally entitled.

(PX-B § 4(a) & Endorsement No. 3.)   In addition, exclusion 4(c)

provides that:

> [t]he insurer shall not be liable to make
> any payment for Loss in connection with any
> Claim made against an Insured: . . . (c)
> arising out of, based upon or attributable
> to the committing of any deliberate criminal
> or fraudulent act by the Insured if a
> judgment or final adjudication . . . adverse
> to the Insured(s) establishes that such
> deliberate criminal or fraudulent act was
> committed.

(Pl. R. 56.1 ¶ 32.)   For the purpose of determining the

applicability of these exclusions, "only facts pertaining to and

knowledge possessed by any past, present or future chairman of

the board, president, chief executive officer, chief operating

officer, chief financial officer, or General Counsel . . . of an

Organization shall be imputed to an Organization."   (Pl. R.

56.1 ¶ 33; PX-B § 4.)

Finally, the First Excess Policy contains a consent-to-

settle provision.   That provision states:

> [t]he Insureds shall not admit or assume any
> liability, enter into any settlement
> agreement, stipulate to any judgment, or
> incur any Defense Costs without the prior
> written consent of the Insurer. Only those
> settlements, stipulated judgments, and
> Defense Costs which have been consented to
> by the Insurer shall be recoverable as Loss

under the terms of this policy. The Insurer's consent shall not be unreasonably withheld . . .

(Pl. R. 56.1 ¶ 44.) 'Loss' is defined, in relevant part, as "damages, settlements, judgments . . . , Defense Costs and Crisis Loss; however, 'Loss' (other than Defense Costs) shall not include . . . (5) any amounts for which an Insured is not financially liable or which are without legal recourse to an Insured . . ." (Pl. R. 56.1 ¶ 43.)

### C.   2006/2007 Policies

From March 12, 2006 through March 12, 2007, SafeNet again had two layers of directors and officers liability insurance. (Pl. R. 56.1 ¶¶ 3, 4; Def. R. 56.1 ¶ 2.) National Union provided the first layer of insurance coverage, which had a $10,000,000 limit ("Renewal Primary Policy"), and plaintiff provided a $5,000,000 layer of excess coverage ("Renewal Excess Policy"). (Pl. R. 56.1 ¶¶ 3-4; Def. R. 56.1 ¶ 8.) As with the earlier policies, the Renewal Excess Policy follows form to the Renewal Primary Policy, subject to its own terms and conditions. (Pl. R. 56.1 ¶ 4; Def. R. 56.1 ¶ 3.)

The Renewal Excess Policy covers the same categories of claims as its predecessor. (PX-D § 1.) Additionally, like the First Excess Policy, the Renewal Excess Policy is a claims made policy and it contains the same language concerning providing notice of claims and relation back. (Compare PX-D § 7 with PX-B

§ 7.)   However, Endorsement Number 15 in the Renewal Excess Policy contains an additional provision that excludes coverage for, among other things, "any claim alleging, arising out of, based upon, attributable to or in any way related directly or indirectly, in part or in whole, to" events described in a specified prior notice of circumstances.   (Pl. R. 56.1 ¶ 22; Def. R. 56.1 ¶ 43.)   The definition of a 'Claim' is the same under both excess policies.

Like the prior policy, the Renewal Excess Policy sets forth circumstances that will void the policy.   Specifically, Endorsement Number 7 states:

> [i]n granting coverage under this policy, it is agreed that the Insurer has relied upon the statements, warranties and representations contained in the Application as being accurate and complete.   All such statements, warranties, and representations are the basis for the policy and are material to the risks assumed by the Insurer. . . The Insureds agree that in the event the particulars and statements contained in the Application are not accurate and complete and materially affect either the acceptance of the risk or the hazard assumed by the insurer under the policy, then the coverage provided by this Policy shall be deemed void <u>ab initio</u> solely with respect to any of the following Insureds:  (1) any Insured Person who knew as of the inception date of the Policy Period the facts that were not accurately and completely disclosed in the application, (2) an Organization . . . [seeking coverage for its losses arising from a claim made against an Insured Period to the extent that the Organization has indemnified such

> Insured Person], to the extent it
> indemnifies any Insured Person referenced in
> (1) above, and (3) an Organization . . .
> [seeking coverage for a loss arising from a
> securities claim against it] if any past or
> present chairman of the board, president,
> chief executive officer, chief operating
> officer, chief financial officer or general
> counsel (or any equivalent position) of an
> Organization knew, as of the inception date
> of the Policy Period, the facts that were
> not accurately and completely disclosed in
> the application, whether or not such Insured
> Person knew that such facts were not
> accurately and completely disclosed in the
> Application . . .

(PX-D at Endorsement No. 7.) The definition of 'Application' in the Renewal Excess Policy mirrors the definition in the First Excess Policy and thus includes statements made in SafeNet's public filings. (PX-D Endorsement No. 6.)

The Renewal Excess Policy also specifies grounds for excluding coverage. The grounds for excluding coverage under the Renewal Excess Policy are materially identical to the exclusions under the prior policy. (Compare, e.g., PX-B § 4(a)-(c) & Endorsement No. 3 with PX-D § 4(a)-(c) & Endorsement No. 2.)

Finally, the Renewal Excess Policy contains a consent-to-settle provision identical to that in the prior policy. (PX-D § 8.)

D.   **Investigations and Litigation**

1.   **Public Disclosures**

As noted in our prior opinion, beginning in 2006, SafeNet began to experience legal trouble.  Specifically, on February 8, 2006, SafeNet disclosed in a Form 8-K that "previously filed Forms 10-Q for the quarters ended June 30, 2005 and September 30, 2005" contained two material errors: "(i) . . . an understatement of lease restructuring charges of approximately $700,000; and (ii) . . . an understatement of the costs and revenues of the classified government business of approximately $600,000."  (Pl. R. 56.1 ¶ 5; PX-E; Def. R. 56.1 ¶ 7.)

On May 18, 2006, SafeNet announced that it had received a subpoena "from the office of the United States Attorney for the Southern District of New York relating to [its] granting of stock options" and that it had "received an informal inquiry from the Securities and Exchange Commission requesting information relating to stock option grants to directors and officers . . . [and] to certain accounting policies and practices."  (Pl. R. 56.1 ¶ 6; DX-7; Def. R. 56.1 ¶ 12.)

Shortly thereafter, SafeNet filed a Form 8-K in which it disclosed that it had formed a special committee to investigate its stock option granting practices.  (Pl. R. 56.1 ¶ 7; Def. R. 56.1 ¶ 16.)  In a later Form 8-K/A, dated September 27, 2006, SafeNet stated that it "has concluded that certain options

grants made between 2000 and 2005 . . . were or likely were accounted for using incorrect measurement dates under applicable accounting rules . . . As a result, [SafeNet] expects that annual and interim financial statements for the periods from 2000 through March 31, 2006 will have to be restated." (Pl. R. 56.1 ¶ 8; PX-F; DX-15; Def. R. 56.1 ¶ 18.)

## 2.   Civil Litigation

Various civil lawsuits were filed shortly after the above-mentioned disclosures.  For example, on August 1, 2006, SafeNet shareholders commenced a class action suit against SafeNet, Argo, Caputo, and numerous other directors and officers of SafeNet ("Class Action").  (Pl. R. 56.1 ¶ 10; Def. R. 56.1 ¶ 17.)  The plaintiffs in the Class Action alleged that the named defendants "issued false and misleading public statements pertaining to SafeNet's stock option grants and executive compensation policies and practices," "falsely portrayed SafeNet's financial condition," and "violated Generally Accepted Accounting Principles." (Pl. R. 56.1 ¶ 11; PX-H ¶¶ 1, 3.)

The plaintiffs in the Class Action amended their complaint on August 1, 2008 and again alleged that the defendants made false and misleading statements in their public filings related to: (1) SafeNet's accounting practices for backdated stock-options grants; and (2) SafeNet's accounting practices for recognizing revenue in product sales.  (Def. R. 56.1 ¶ 30.)  On

August 5, 2009, the Honorable Paul A. Crotty dismissed certain of the claims in the amended complaint. Additionally, Judge Crotty dismissed all of the individual defendants other than Caputo and Argo. (Def. R. 56.1 ¶ 31.)

The Class Action plaintiffs moved for leave to file a second amended complaint in February 2010. (Def. R. 56.1 ¶ 32.) Thereafter, the parties stipulated to the filing of the amendment and agreed that "all non-options backdating based claims contained in paragraphs 123 through 159 . . . would be dismissable on the same loss causation grounds set forth in the Court's August 2009 Order . . ." (Def. R. 56.1 ¶ 32; PX-27.)

### 3. Enforcement Actions

In addition to facing lawsuits involving private plaintiffs, SafeNet and its personnel were named defendants in various criminal and civil enforcement actions. For example, Argo was named as a defendant in a complaint filed by the Securities and Exchange Commission ("SEC") and in a criminal indictment in the Southern District of New York in 2007. (Pl. R. 56.1 ¶ 35.)

On October 5, 2007, Argo pleaded guilty to a single count of securities fraud relating to the backdating of SafeNet stock options. (Pl. R. 56.1 ¶ 36.) In her plea allocution, Argo explained her criminal conduct as follows:

> [i]n mid-2000 I became responsible for overseeing SafeNet's process for granting and documenting stock options. Sometime in December 2001 or early January 2002, SafeNet's compensation committee approved a grant of stock options to me and two other individuals, one of whom was the company's CEO. The CEO asked me to report October 1, 2001 as the day on which his options had been approved. SafeNet's stock price on October 1, 2001 was its lowest stock price in the quarter. . . . I did so and the compensation committee approved this treatment, even though [I and] others knew that the compensation committee had not granted the options on that date. . . . By using October 1 as the grant date, SafeNet avoided reporting any compensation expense. . . . As a result of using October 1, 2001 as the grant date, SafeNet's public filings included inaccurate compensation expense information. . . . In causing these filings to be inaccurate, I acted willfully and with intent to defraud.  In the following years, with [] respect to certain grants, I and others at SafeNet selected with hindsight grant dates with a low price . . . as a result of my conduct, the company's public filings were inaccurate in this respect.

(Pl. R. 56.1 ¶¶ 37-40; PX-O at 17-18; Def. R. 56.1 ¶ 21.)

Before Argo's sentencing, defense counsel filed a sentencing submission with the court, which noted that the Government had calculated the financial impact of SafeNet's stock options backdating. According to the Government's report, "SafeNet understated its compensation expense . . . for all of its option grants by a total of $13.7 million. Of this in-the-money amount, SafeNet employees realized approximately $4

million by exercising options." (Pl. R. 56.1 ¶ 42; Def. R. 56.1 ¶ 22.)

Additionally, in November 2009, the SEC filed a civil injunctive action against SafeNet, Caputo, Kenneth Mueller (another former CFO of SafeNet), and three former SafeNet accountants. In the complaint, the SEC alleged that from the fourth quarter of 2000 through May 2006, SafeNet engaged in two fraudulent schemes, one involving the backdating of options and the other earnings management. (Pl. R. 56.1 ¶¶ 15-16; PX-K.) On the day the complaint was filed, all defendants agreed to settle the action without admitting or denying the allegations in the complaint. (PX-K.)

### E.   Insurance Coverage Disputes

SafeNet and its insurers exchanged a number of letters concerning claims relating to the above-mentioned events. The correspondence also detailed the parties' respective positions on whether coverage was available to SafeNet or its personnel.

For example, on February 28, 2006, SafeNet sent National Union a letter and enclosed a copy of its Form 8-K, dated February 8, 2006, and the exhibits attached thereto, which disclosed the above-described revenue recognition issues ("February 2006 Notification"). (Pl. R. 56.1 ¶ 5; Def. R. 56.1 ¶ 6.) The February 2006 Notification stated that "to the extent the events described in the above-referenced filing constitute

'circumstances which may give rise to a Claim' against SafeNet, we hereby provide notice of said circumstances." (Pl. R. 56.1 ¶ 5.)

In April 2006, National Union accepted the February 2006 Notification as "a notice of circumstances which may give rise to a claim pursuant to Section 7(c) of the [First Primary Policy]." (Def. R. 56.1 ¶ 10.) In July 2006, plaintiff likewise accepted the notification as notice of circumstances pursuant to section 7(c). (Def. R. 56.1 ¶ 11.)

On June 4, 2006, SafeNet notified National Union, who in turn notified plaintiff, of a number of investigations and lawsuits, including the SEC's letter of inquiry, the grand jury subpoena from the United States Attorney for the Southern District of New York, and a number of shareholder derivative suits. (Def. R. 56.1 ¶ 13.) Thereafter, plaintiff acknowledged receipt of the correspondence. (Def. R. 56.1 ¶ 14.)

SafeNet later advised National Union and plaintiff about the Class Action. Then, on October 16, 2006, National Union informed SafeNet that coverage for the Class Action was only available (if at all) under the First Primary Policy. (Pl. R. 56.1 ¶ 17; Def. R. 56.1 ¶ 19.) On February 2, 2007, plaintiff sent a letter to SafeNet that provided, in relevant part:

> [i]t is National Union's view that only the Policy Period of the [First Primary Policy] applies. . . . Federal continues to

> investigate whether the matters contained in
> the Notices of Claims relate to the
> particulars of the [February 2006
> Notification]. Federal reserves its rights
> accordingly.

(Pl. R. 56.1 ¶ 18; PX-M; Def. R. 56.1 ¶ 20.)

On April 21, 2008, National Union informed SafeNet that following Argo's guilty plea, SafeNet was no longer entitled to coverage under the First Primary Policy. (Def. R. 56.1 ¶ 24.) On June 27, 2008, plaintiff sent a letter to SafeNet also concerning the effects of Argo's guilty plea. In that letter, plaintiff advised SafeNet that:

> it is our view that, for the reasons that
> follow, a declination of coverage is in
> order in certain respects under the [First
> Excess Policy] described below and that
> rescission of this policy may be appropriate
> . . . Federal intends to pursue the issue
> of rescission. However, so the parties may
> jointly consider these matters further,
> Federal respectfully proposes that it and
> the Insureds (other than Argo) agree to
> enter into a tolling agreement.

(Pl. R. 56.1 ¶ 55; DX-22; Def. R. 56.1 ¶ 27.) In its June 27, 2008 letter, plaintiff also informed SafeNet of its position that the First Excess Policy applied to SafeNet's claims. (Def. R. 56.1 ¶ 28.) Plaintiff reiterated its coverage position in a letter dated August 12, 2008, again noting that plaintiff intended to pursue the issue of rescission and requesting that SafeNet enter into a tolling agreement. (Def. R. 56.1 ¶ 29; DX-23.)

### F.   Payments by SafeNet

SafeNet settled the Class Action in late 2010 for $25,000,000 and subsequently paid the settlement amount.[3]   (Pl. R. 56.1 ¶¶ 45, 47; Def. R. 56.1 ¶ 33.)   Although both the First Excess Policy and the Renewal Excess Policy contain consent-to-settle provisions, as discussed above, SafeNet did not notify plaintiff of the settlement negotiations and did not seek or obtain plaintiff's consent prior to settling the Class Action. (Pl. R. 56.1 ¶ 46.)

According to Kevin Hicks, who served as SafeNet's General Counsel or a member of its legal staff during the time periods relevant to this action, "SafeNet has paid more than $20 million in defense costs for itself and all directors and officers in connection with the Stock Option Backdating Claims."   (Affidavit of Kevin Hicks ("Hicks Aff.") at ¶¶ 3, 5.)   Hicks also declares on information and belief that SafeNet has paid more than $10 million in defense costs "for officers and directors, other than Argo, in connection with the Stock Options Back-Dating Claims."[4] (Hicks Aff. at ¶ 6.)

---

[3] The parties dispute whether the settlement was paid on behalf of SafeNet or on behalf of SafeNet and the other individual defendants who were originally named in the Class Action.   However, it is undisputed that as of December 2010, SafeNet had not determined whether or not it would indemnify any Insured Person in connection with the Class Action.   (R. 56.1 ¶ 49.)

[4] Plaintiff objects to the above-mentioned statements in the Hicks Affidavit on the grounds that they are inadmissible legal conclusions concerning indemnification.   In response, SafeNet states that the Hicks Affidavit includes facts, not legal conclusions, and that Hicks does not purport to

## II.   Procedural Background

Plaintiff filed its complaint in September 2009, on the basis of diversity jurisdiction.   In its complaint, plaintiff seeks declarations concerning its obligations under the excess insurance policies and seeks rescission of the Initial Excess Policy.

After the parties failed to reach an agreement to stay the case pending resolution of some of the underlying litigation, including the Class Action, defendants filed a motion to dismiss pursuant to Rules 12(b)(1) and 12(b)(7) of the Federal Rules of Civil Procedure.   In that motion, defendants argued that the action was not ripe for adjudication because the primary layer of insurance was not exhausted.   Additionally, defendants argued that the action should be dismissed for failure to join certain necessary parties, including National Union.   On December 7, 2010, this Court denied the defendants' motion to dismiss.

Following our denial of the motion, each of the defendants filed an answer and counterclaims against plaintiff. Thereafter, the parties filed cross motions for summary judgment.

In its motion, plaintiff seeks the following rulings:

---

opine on whether SafeNet "advanced" defense costs in compliance with Delaware law, nor whether any advancement constitutes indemnification.   (Plaintiff Federal Insurance Company's Evidentiary Objections to the Affidavit of Kevin Hicks, dated Mar. 18, 2011; Defendant SafeNet's opposition to Plaintiff's Evidentiary Objections to the Affidavit of Kevin Hicks, dated Apr. 5, 2011.)

- a declaration that the First Excess Policy does not provide coverage for Argo or SafeNet;

- a declaration that the First Excess Policy does not provide coverage for any "Insured Person" because no "Insured Person" incurred a loss in connection with the recently-settled Class Action;

- a declaration that even if an Insured Person incurred a loss, no coverage is available unless the Insured Person could establish: (a) that the loss was Non-Indemnifiable; and (b) he or she lacked actual knowledge of facts not accurately disclosed in SafeNet's Application; and

- a declaration that there is no coverage for the settlement of the Class Action in light of SafeNet's failure to notify plaintiff or seek its consent.

In its cross motion, defendants seek the following rulings:

- a declaration that claims concerning stock option backdating fall within the 2006/2007 policy period, not the 2005/2006 policy period;

- a declaration that plaintiff has waived its right to seek rescission of the Renewal Excess Policy; and

- a declaration that SafeNet and other Insureds did not need to seek plaintiff's consent before settling the class action in light of plaintiff's prior denial of coverage.

We address these requests below.

**DISCUSSION**

I. **Legal Standard**

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The "mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact."  Scott v. Harris, 550 U.S. 372, 380 (2007) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986)); see also Quarles v. Gen. Motors Corp., 758 F.2d 839, 840 (2d Cir. 1985).  "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment."  Anderson, 477 U.S. at 248.

On a motion for summary judgment, the initial burden rests with the moving party to make a prima facie showing that no material fact issues exist for trial.  See Celotex Corp. v. Catrett, 477 U.S. 317, 330-31 (1986).  Once this showing is made, "[t]o defeat summary judgment, the non-movant must produce specific facts" to rebut the movant's showing and to establish that there are material issues of fact requiring trial.  Wright v. Coughlin, 132 F.3d 133, 137 (2d Cir. 1998) (citing Celotex, 477 U.S. at 322).  In determining whether a genuine issue of

material fact exists, a court must view the facts in the light most favorable to the non-moving party and make all reasonable inferences in that party's favor.  See Fincher v. Depository Trust & Clearing Corp., 604 F.3d 712, 720 (2d Cir. 2010).

Additionally, in determining the appropriateness of a grant of summary judgment, we may rely only on admissible evidence. Ehrens v. Lutheran Church, 385 F.3d 232, 235 (2d Cir. 2004) (citing Feingold v. New York, 366 F.3d 138, 155 n.17 (2d Cir. 2004); Nora Beverages, Inc. v. Perrier Grp. of Am., Inc., 269 F.3d 114, 123 (2d Cir. 2001)).

## II.  Analysis

### A.  Applicable Law

Where a district court sits in diversity, it must apply the choice of law rules of the forum in which it sits.  Schwartz v. Liberty Mut. Ins. Co., 539 F.3d 135, 147 (2d Cir. 2008) (citing Klaxon Co. v. Stentor Elec. Mfg. Co., Inc., 313 U.S 487, 496-97 (1941); see also Fin. One Pub. Co. Ltd. v. Lehman Bros. Special Fin., Inc., 414 F.3d 325, 331 (2d Cir. 2005), cert. denied 548 U.S. 904 (2006).  Thus, we apply New York choice of law rules in the present context.

In contract disputes, New York courts apply the 'center of gravity' or 'grouping of contacts' theory of conflict of laws, see Md. Cas. Co. v. Cont'l Cas. Co., 332 F.3d 145, 151-52 (2d Cir. 2003), which requires a court to apply "the law of the

place which has the most significant contacts with the matter in
dispute." Id. In cases involving insurance contracts, New York
courts look to the following factors identified in the
Restatement (Second) of Conflict of Laws: "[1] the location of
the insured risk; [2] the insured's principal place of business;
[3] where the policy was issued and delivered; [4] the location
of the broker or agent placing the policy; [5] where the
premiums were paid; and [6] the insurer's place of business."
Seidel v. Houston Cas. Co., 375 F. Supp. 2d 211, 220 (S.D.N.Y.
2005) (Lynch, J.) (collecting cases); see also Md. Cas. Co., 332
F.3d at 151-52 (citing Zurich Ins. Co. v. Shearson Lehman
Hutton, Inc., 84 N.Y.2d 309, 317, 642 N.E.2d 1065, 1068, 618
N.Y.S.2d 609, 612 (1994)).

    "Most important in the context of insurance contracts is
'the local law of the state which the parties understood was to
be the principal location of the insured risk . . . unless with
respect to the particular issue, some other state has a more
significant relationship under the principles stated in
[Restatement (Second) of Conflict of Laws] § 6 to the
transaction and the parties.'" Seidel, 375 F. Supp. 2d at 220
(quoting Zurich, 84 N.Y.2d at 318). Courts in this Circuit have
applied these choice of law principles to many types of
insurance contracts, including to directors and officers
liability insurance. See Schwartz, 539 F.3d at 151-52.

Here, plaintiff contends that Maryland law should apply. In support of its argument, it notes that SafeNet's principal place of business is Maryland, Argo is domiciled in Maryland, and insurance premium bills were delivered to SafeNet in Maryland. By contrast, defendants argue that Delaware law should apply on the grounds that under the insurance policies, when the parties arbitrate or mediate, the law of the state where SafeNet is incorporated -- namely, Delaware -- shall be considered. (PX-B § 17 ("The mediator or arbitrators shall also give due consideration to the general principles of the law of the state where the Named Entity is incorporated in the construction or interpretation of the provisions of this policy."); PX-D § 17 (same).)

We agree that Maryland law applies. The principal place of the insured risk is in Maryland, the insured's principal place of business is likewise in Maryland, and the other factors identified in <u>Zurich</u> counsel in favor of concluding that Maryland law applies. The existence of the alternative dispute resolution provision referenced above does not support a colorable argument that Delaware has a more significant relationship to the transaction or to the parties.

**B.   Applicable Excess Insurance Policy**

Defendants seek a declaration that the Renewal Excess Policy applies because the investigations and lawsuits at issue

here were initiated during the 2006/2007 policy period. Specifically, defendants argue that the stock option backdating issues were not discovered until the middle of 2006 and therefore cannot relate back to the February 2006 Notification.

Plaintiff argues that the First Excess Policy applies because SafeNet gave notice of facts and circumstances that gave rise to the underlying litigations and investigations in the February 2006 Notification. Plaintiff further argues that both excess policies contain broadly-worded relation-back provisions (PX-B § 7; PX-D § 7 & Endorsement No. 15), which were designed to prohibit the application of claims such as these to a later policy period.

As further described herein, many of our conclusions are the same under either policy. However, to the extent that a declaration concerning the applicable policy is necessary, we conclude that the First Excess Policy is the policy that is applicable to the Class Action.

Section 7(c) of the First Excess Policy provides that when an Insured becomes "aware of any circumstances which may reasonably be expected to give rise to a Claim being made against an Insured," the Insured must give notice to the Insurer. (PX-B § 7(c).) After such notice is given, "a Claim which is subsequently made against such an Insured . . . alleging, arising out of, based upon, or attributable to such

25

circumstances or alleging any Wrongful Act which is the same or related to any Wrongful Act alleged or contained in such circumstances, shall be considered made at the time such notice of circumstances was given." (Id.)  Section 7(c) is consistent with the language in the Renewal Excess Policy, which prohibits coverage under the renewal policy of a Claim that "alleg[es], aris[es] out of, [is] based upon, or attributable to or in any way related directly or indirectly, in part or in whole" to the facts disclosed in the February 2006 Notification.  (PX-D at Endorsement No. 15(B).)  These provisions make clear that the relation back of a claim turns upon the nature of the allegations in a subsequent Claim, not simply on the relationship in fact between an earlier notice of circumstances and a later Claim.

Here, the plaintiffs in the Class Action alleged that the financial irregularities disclosed in the February 2006 Notification and the stock options backdating were part of an interrelated course of conduct.  (See, e.g., PX-H at ¶ 3; PX-I at ¶¶ 1, 3.)  Because the alleged interrelationship between the two types of conduct, the broad relation-back language in the two policies make clear that the Claim concerning the Class Action relates back to the original February 2006 Notification, and therefore is covered, if at all, by the First Excess Policy.

### C.   Declaratory Judgment Claim

#### 1.   Does the Applicable Policy Provide Coverage to Argo?

Next, we turn to plaintiff's request for a declaration that the relevant policy does not provide coverage for Argo.

We conclude that any loss incurred by Argo is barred by exclusion 4(c) of the First Excess Policy and Endorsement Number 3 thereto.   As noted above, these provisions provide that plaintiff is not liable to make a payment "arising out of, based upon or attributable to the committing of any deliberate criminal or fraudulent act by the Insured if a judgment or final adjudication . . . adverse to the Insured(s) establishes that such deliberate criminal or fraudulent act was committed." (PX-B § 4 & Endorsement No. 3.)   As detailed above, Argo pleaded guilty to fraudulent acts, allocuted to willful and deliberate conduct, and an adverse judgment was entered against her.   Thus, we conclude that exclusion 4(c) bars coverage of Argo's losses.

We would reach the same conclusion if the Renewal Excess Policy applied.   Under that policy, any loss incurred by Argo would be excluded under section 4(c) and the relevant endorsement. (PX-D § 4(c) & Endorsement No. 2.)   The provisions of the renewal policy are materially identical to the provisions of the earlier policy and our conclusion concerning the effect

of the plea colloquy and associated judgment would apply with equal force.

Accordingly, we conclude that the Initial Excess Policy and the Renewal Excess Policy do not provide coverage to Argo.

### 2. Does the Applicable Policy Provide Coverage to SafeNet?

We then turn to plaintiff's request for a declaration that the relevant policy does not provide coverage for SafeNet as a result of Argo's guilty plea.

In particular, plaintiff argues that exclusion 4(a) or 4(c) excludes coverage as to SafeNet because, as SafeNet's former chief financial officer, Argo's deliberate fraudulent conduct may be imputed to SafeNet. (PX-B § 4 ("only facts pertaining to and knowledge possessed by any past, present or future chairman of the board, president, chief executive officer, chief operating officer, chief financial officer, or General Counsel (or equivalent position) of an Organization shall be imputed to an Organization.").)

Defendants argue, among other things, that the imputation provision quoted above does not survive the incorporation of Endorsement 3 into the First Excess Policy. Defendants further argue that exclusions 4(a) and 4(c) require an adverse judgment against the insured, and even if the imputation provision were to apply, it only permits the imputation of

"facts" and "knowledge" to SafeNet, not the imputation of a judgment.

We agree with plaintiff that the imputation provision is applicable, even in light of the endorsement noted above. Endorsement 3 merely inserts the need for a final, adverse judgment into the language of exclusions 4(a) and 4(c); it does not eliminate or alter the remaining language in section 4. However, the language in this section only permits the imputation of "facts" and "knowledge" possessed by Argo to SafeNet. Thus, because an adverse judgment is required and no judgment can be imputed to SafeNet, exclusions 4(a) or 4(c) in and of themselves do not apply to SafeNet. Again, our conclusion would not be altered if we were to apply the Renewal Excess Policy. (See PX-D § 4 & Endorsement No. 2.)

Thus, we cannot declare that the exclusions at issue bar coverage for SafeNet. However, as detailed below, our conclusion that these specific exclusions do not apply does not lead to the conclusion that SafeNet is entitled to coverage under either policy.

### 3.   What Coverage Is Available, If Any, to Other Insured Persons?

Next, plaintiff seeks a declaration that no Insured Person incurred a loss in connection with the recently-settled Class Action. In support of its argument, plaintiff contends that the

settlement was paid by SafeNet and was a payment on behalf of SafeNet only.  By contrast, defendants contend that nearly $10 million has been expended on defense costs for officers and directors of SafeNet (excluding Argo and the company itself) but that no decisions concerning indemnification have been made to date.

Plaintiff seeks an alternative declaration that, if a loss were incurred by other Insured Persons, coverage is only available to that person if the person establishes that: (1) the loss was Non-Indemnifiable; and (2) the person lacked actual knowledge of facts not accurately disclosed in SafeNet's Application.  (PX-B at Endorsement No. 4.)

At this time, plaintiff's argument ultimately boils down to the position that there is no record evidence that SafeNet has indemnified any particular officer or director and therefore we should not address the scope of coverage remaining for them. Defendants, on the other hand, argue that it is not appropriate to make a declaration concerning whether other Insureds incurred a loss because final coverage decisions have not been made. Given these positions and the undeveloped state of the record concerning the other Insureds, we do not reach this issue at this time.

4.   **Impact of the Consent-to-Settle Provision**

Next, plaintiff and defendants seek competing declarations concerning the impact of the consent-to-settle provision. (PX-B § 8 ("The Insureds shall not admit or assume any liability, enter into any settlement agreement, stipulate to any judgment, or incur any Defense Costs without the prior written consent of the Insurer. Only those settlements, stipulated judgments, and Defense Costs which have been consented to by the Insurer shall be recoverable as Loss under the terms of this policy."); PX-D § 8 (same).)

The parties agree that SafeNet did not confer with or advise plaintiff before settling the Class Action for $25 million. Additionally, defendants do not contest the enforceability of the consent-to-settle provision in either of the excess insurance policies. See Nationwide Mut. Ins. Co. v. Webb, 291 Md. 721, 740, 436 A.2d 465, 476 (Md. 1981) ("Unlike 'consent to sue' clauses, 'consent to settle' clauses are generally upheld, at least to the extent that settlements, consent judgments, releases, covenants not to sue, etc. between Insureds and the uninsured motorists are not binding upon insurers unless the insurers have given their consent."); see also Continental Cas. Co. v. Ace American Ins. Co., No. 07 Civ. 958 (PAC), 2009 WL 857594, at *3 (S.D.N.Y. Mar. 31, 2009) ("Under New York law, consent-to-settle provisions are a

condition precedent to coverage and are routinely enforced.").
Thus, the relevant issue is whether plaintiff had denied or
repudiated coverage.

Here, plaintiff has not issued a blanket denial of
coverage. Rather, in its correspondence with SafeNet, plaintiff
repeatedly informed SafeNet that it was investigating its
obligations under the policies, that it believed partial
rescission was appropriate, that coverage would remain for
certain Insureds who lacked knowledge of the inaccurate
information in the insurance application, and that it would seek
judicial input concerning its obligations under the applicable
policy. (See, e.g., PX-22, PX-23.) In light of these facts, we
cannot conclude that SafeNet was excused from complying with the
consent-to-settle provisions in the excess insurance policies.
Accordingly, as a result of its failure to comply with the
consent-to-settle provision, SafeNet may not recover the
settlement amount.

### D.   Rescission Claim

Finally, defendants seek a declaration that Federal has
waived its right to seek rescission of the Renewal Excess
Policy. Because we conclude that the First Excess Policy is the
applicable policy, we needed not reach the issue of waiver.

Additionally, as stated above, the First Excess Policy
contains provisions detailing circumstances that will render the

policy  void  <u>ab</u>  <u>initio</u>.    Specifically,  Endorsement  Number  4

provides that "it is agreed that the Insurer has relied upon the

statements,  warranties  and  representations  contained  in  the

Application  as  being  accurate  and  complete.    All  such

statements,  warranties,  and  representations  are  the  basis  for

the  policy  and  are  material  to  the  risks  assumed  by  the

Insurer."  (<u>Id.</u>)  The endorsement further provides that: "this

Policy shall be void as to any Insured who knew as of the

inception date of the Policy Period of the facts that were not

accurately and completely disclosed in the Application (whether

or not the Insured actually knew the facts were not accurately

disclosed in the Application) and as to any Insured to whom such

knowledge is imputed."  (PX-B at Endorsement No. 4.)  As noted

above, the term 'Application' is defined to include SafeNet's

public filings.

      As a threshold matter, it is undisputed that Argo signed

SafeNet's public filings, that Argo pleaded guilty to securities

fraud, and that during her plea colloquy, Argo stated that she

caused the company's public filings to be inaccurate.  Moreover,

Argo  allocuted  that  "[i]n  causing  these  filings  to  be

inaccurate, I acted willfully and with intent to defraud."  (PX-

O.)  Accordingly, there were statements in the Application that

were undisputedly inaccurate and Argo knew of the inaccuracy of

those  statements.    Thus,  under  Endorsement  Number  4,  the  First

Excess Policy is void _ab initio_ as to Argo and the Court need not conduct a further inquiry into whether the inaccuracies were material or whether Argo was aware that her statements would be incorporated into the insurance application.[5]

Additionally, Endorsement Number 4 further provides that "knowledge possessed by a past or present . . . chief financial officer of the Named Entity shall be imputed to all Insureds . . . ." The Endorsement permits other individuals to establish

---

[5] Although we need not inquire whether Argo's misstatements were material, the misstatements would plainly meet the materiality standard under Maryland law. Section 12-207 of the Maryland Insurance Code provides that:

> A misrepresentation, omission, concealment of facts, or incorrect statement does not prevent a recovery under the policy or contract unless: (1) the misrepresentation, omission, concealment, or statement is fraudulent or material to the acceptance of the risk or to the hazard that the insurer assumes; or (2) if the correct facts had been made known to the insurer, as required by the application for the policy or contract or otherwise, the insurer in good faith would not have: (i) issued, reinstated, or renewed the policy or contract; (ii) issued the policy or contract in as large an amount or at the same premium or rate; or (iii) provided coverage with respect to the hazard resulting in the loss.

Md. Ins. Code § 12-207(b); see also Jackson v. Hartford Life & Annuity Ins. Co., 201 F. Supp. 2d 506, 512-13 (D. Md. 2002) ("A material misrepresentation is one that may reasonably have affected the determination of the acceptability of the risk. . . . An insurer may avoid the policy based on a misrepresentation, because the issuance of an insurance policy based on material misrepresentations results in the assumption by the insurer of a risk different from that which the applicant led it to suppose it was assuming.") (internal quotations and citations omitted). The undisputed facts plainly support a conclusion of materiality: according to the Government's estimate, the result of SafeNet's stock options backdating was a $13.7 million understatement of the company's compensation expense (DX-P); in 2006, SafeNet's management concluded that two errors of a much smaller magnitude -- $600,000 and $700,000 -- were material and required restatement of the company's financial statements; the amount of the settlement of the Class Action would have more than exhausted both the primary and excess layers of SafeNet's director and officer liability insurance coverage; and the activities subjected SafeNet to multiple enforcement actions. Accordingly, we would not hesitate to conclude that there is no genuine issue of material fact concerning the materiality of the misstatements at issue.

that they lacked actual knowledge; however, it does not permit the company itself to establish that it lacked knowledge of the facts that were not accurately and completely disclosed. (PX-B at Endorsement No. 4.)  It is undisputed that Argo was SafeNet's chief financial officer and that, under the express language of the First Excess Policy, Argo's knowledge is imputed to SafeNet. Thus, Argo's guilty plea renders the policy void ab initio as to SafeNet.[6]

Accordingly, we conclude that plaintiff has established that there is no genuine issue of material fact concerning plaintiff's entitlement to partial rescission of the First Excess Policy.

<u>CONCLUSION</u>

For the foregoing reasons, plaintiff's motion for summary judgment (docket no. 44) is granted in part and denied in part and defendants' cross motion for summary judgment (docket no. 49) is denied.  In sum, we conclude that:

- Maryland law applies to the construction of the insurance policies;

- the Claims relating to the Class Action trigger the First Excess Policy;

---

[6] We note that we reject defendants' arguments that SafeNet did not know about the conduct at issue and that the conduct at issue was not material.  The facts recited above plainly demonstrate that Argo did not act alone, and that others within the company were involved in the same criminal and/or fraudulent conduct.

- the First Excess Policy does not provide coverage to Argo;

- SafeNet may not recover its losses stemming from the $25 million settlement of the Class Action in light of its failure to comply with the applicable consent-to-settle provision; and

- partial rescission (as to Argo and to SafeNet) of the First Excess Policy is appropriate.

Counsel for all parties shall appear for a telephonic status conference on October 5, 2011 at 2:30 p.m. and shall be prepared to discuss a proposed course of action concerning any remaining claims and/or counterclaims.

Dated:    New York, New York
          September 9, 2011

                                    _____
                                    NAOMI REICE BUCHWALD
                                    UNITED STATES DISTRICT JUDGE

Copies of the foregoing Order have been mailed on this date to
the following:

**Attorneys for Plaintiff**
Michael F. Perlis, Esq.
Richard R. Johnson, Esq.
Locke Lord Bissell & Liddell LLP
300 S. Grand Ave Suite 2600
Los Angeles, CA 90071

**Attorney for Defendant SafeNet, Inc.**
Ann V. Kramer, Esq.
Reed Smith LLP
599 Lexington Avenue
New York, NY 10022

Duane F. Sigelko, Esq.
Reed Smith LLP
10 South Wacker Drive
Chicago, IL 60606-7507

**Attorneys for Defendant Carole Argo**
Matthew B. Holmwood, Esq.
Benjamin C. Brown, Esq.
Wilmer Cutler Pickering Hale & Dorr LLP
1875 Pennsylvania Avenue, NW
Washington, DC 20006

**Attorney for Defendant Anthony Caputo**
John A. Freedman, Esq.
Joshua P. Wilson, Esq.
Arnold & Porter, LLP
555 Twelfth Street, N.W.
Washington, DC 20004